IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2001

## STATE OF TENNESSEE v. ROBERT MORROW

**Appeal from the Criminal Court for Cocke County**
**Nos. 7793 & 7794     Robert Cupp, Judge, sitting by interchange**

---

**No. E2000-02796-CCA-R3-CD**
**September 18, 2001**

---

The defendant entered a best-interest guilty plea in the Cocke County Criminal Court to one count of especially aggravated kidnapping, two counts of aggravated rape, and one count of criminal exposure to HIV. The trial court sentenced the defendant as a Range I standard offender to six years incarceration in the Tennessee Department of Correction for the criminal exposure to HIV conviction, as a violent offender to 24 years incarceration for the especially aggravated kidnapping conviction, as a violent offender to 24 years incarceration for one of the aggravated rape convictions, and as a multiple rapist to 24 years incarceration for the other aggravated rape conviction. The trial court ordered consecutive service of the sentences for an effective sentence of 78 years incarceration. On appeal, the defendant takes issue with the length of the sentences and the consecutive service imposed. Based upon our review, we affirm the sentences imposed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ROBERT W. WEDEMEYER, JJ., joined.

Edward C. Miller, District Public Defender; Susanne Bales, Assistant Public Defender (on appeal); and Edward C. Miller, Assistant Public Defender (at trial), for the Appellant, Robert Morrow.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Alfred C. Schmutzer, Jr., District Attorney General; and James B. Dunn, Assistant District Attorney General for the Appellee, State of Tennessee.

**OPINION**

On March 15, 1999, TH, who at the time was a 16-year old high school student,[1] was working alone at Tropical Pets in Greenville. Between 8:00 p.m. and 8:20 p.m., the defendant,

---

[1] It is the policy of this court to use initials when referring to a minor who has been sexually victimized.

Robert Morrow, came into the store and inquired about gerbils. He left when another customer came into the store, but he returned when the customer departed. The defendant approached TH from behind and held a gun to her head. When she tried to escape, the defendant became enraged; he slammed TH against the wall and screamed for her to open her mouth. When she complied, he stuck the gun in her mouth and threatened to kill her if she "tried that again."

The defendant immobilized TH with flexicuffs[2] and forced her into his truck. He put a toboggan over her head and drove around for about 45 minutes. The defendant took TH to a cabin in a deserted area. He told her that if she did anything, "he'd cut [her] and just leave [her]." Inside the cabin, the defendant again put a gun to her head and asked her if she knew "what was fixing to happen." TH replied that she just wanted to go home. The defendant cocked the gun, and TH began crying. Her crying angered the defendant, and he told her to stop.

The defendant removed the toboggan and flexicuffs and ordered TH to remove all her clothes except her bra and panties. He chained her hands together behind her back, put a tobacco stick between her ankles, and tied her feet apart. The defendant then tied a rope to her hands, already chained behind her back. The rope was thrown over a rafter in the cabin, and the defendant tightened the rope until TH was standing on her toes, partially suspended in air.

While tracing TH's suspended body with a knife, the defendant told TH that she was going to be his "sex toy" for awhile. He offered her the choice of performing fellatio on him for either five or ten minutes. If only for five minutes, the defendant would do anything he wanted with her body, but if for ten minutes, he would just touch her chest. TH chose ten minutes whereupon the defendant cut the rope suspending TH. With her arms and legs still tied, TH performed oral sex on the defendant. When he ejaculated, he ordered her to swish the semen around her mouth before swallowing it. When TH finished, her stomach was hurting "real bad like [she] was going to puke." Afterwards, the defendant put TH in bed.

Despite that the defendant had assured TH that he would not touch her until the next day, he abruptly changed his mind. The defendant ripped off her panties and vaginally raped her. When TH tried to resist, the defendant shoved and hit her. The defendant also joked and taunted TH that she could be pregnant. After raping TH, the defendant fell asleep. TH saw her chance to escape and left the cabin unclothed. The temperature was below freezing, but she hid in the woods until the defendant drove off in his truck. TH returned to the cabin and stayed until sunrise, when she wrapped herself in a blanket, walked to a nearby trailer, and summoned the police.

TH provided the police with a description of the defendant and the license tag number on his truck. From that information, the police determined the defendant's identity. The defendant was arrested a few days later in Louisiana; he had in his possession TH's panties, a gag, ropes,

---

[2] As described in *State v. Ronald W. Byrd*, No. E2000-00520-CCA-R3-CD, slip op. at 2 n.1 (Tenn. Crim. App., Knoxville, July 26, 2001), a flexicuff "is a thin strip of plastic that bends to form a circle that binds a suspect's hands." After the device is secured, "the cuff can only be removed by cutting the plastic." *Id.*

handcuffs, and a cordless telephone that had been taken from the pet store. The defendant, it was learned, was HIV positive, having contracted the AIDS virus in 1985 when he was stationed in Korea.

The defendant was charged with two counts of aggravated rape, one count of especially aggravated kidnapping, and one count of criminal exposure to HIV. *See* Tenn. Code Ann. §§ 39-13-109 (exposure to HIV), -305 (especially aggravated kidnapping), -502 (aggravated rape) (1997). He entered a best interest plea to the charges with no agreement about sentencing. A detailed presentence report was prepared and submitted to the trial court. Attached to the report were victim impact letters from the victim's mother and sister. At the sentencing hearing, the trial court heard testimony from the victim and the defendant's mother, and the defendant offered an unsworn statement. At the conclusion of the hearing, the trial court imposed a total effective sentence of 78 years incarceration: six years as a Range I standard offender for the criminal exposure to HIV conviction; 24 years as a violent offender for the especially aggravated kidnapping conviction; 24 years as a violent offender for one of the aggravated rape convictions; and 24 years as a multiple rapist for the other aggravated rape conviction.

The defendant complains on appeal that the trial court erroneously applied several enhancement factors to increase the length of his sentences and erroneously ordered consecutive service of his sentences. The defendant does not specify what sentences he considers to be appropriate; he claims only that the sentences should be reduced and that some portion of the sentences should be served concurrently. For the reasons that follow, we decline to disturb these sentences on appeal.

## I. Standard of Review

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see State v. Hooper,* 29 S.W.3d 1, 5 (Tenn. 2000). "The burden of showing that the sentence is improper is upon the appellant." *Ashby*, 823 S.W.2d at 169. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id.* If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989. At the conclusion of the sentencing hearing, the trial court determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing

hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210(a), (b) (Supp. 2000); *id.* § 40-35-103(5) (1997).

The defendant's convictions for aggravated rape and especially aggravated kidnapping are classified as Class A felonies. *Id.* §§ 39-13-305(b)(1), -502(b) (1997). Accordingly, in arriving at appropriate sentences for these offenses, the sentencing court starts with the presumption that the defendant should receive a sentence in the midpoint of the range without any enhancement or mitigating factors. *Id.* § 40-35-210(c) (Supp. 2000). If enhancement or mitigating factors do apply, the sentencing court is directed first to "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." *Id.* § 40-35-210(d), (e). The same analysis applies to the defendant's conviction for criminal exposure to HIV, which is a Class C felony, except the sentencing court starts with the presumption that the defendant should receive a minimum sentence in the range without any enhancement or mitigating factors. *Id.* § 40-35-210(c). In undertaking this task, the sentencing court is required to make on the record specific findings of fact supporting the application of each factor. *Id.* § 40-35-210(f). Provided the court follows the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record, we will not disturb the ultimate sentence ordered.

## II.  Enhancement Factors

Enhancement factors may be considered only if they are "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114 (Supp. 2000). This statutory limitation is designed to neutralize the risk of repetitive punishment; it operates to exclude enhancement factors that are not supported by the facts and circumstances of the offense and enhancement factors that are supported by the facts but which duplicate the evidence establishing the elements of the conviction offense. *See State v. Jones*, 883 S.W.2d 597, 601 (Tenn. 1994). With these principles in mind, we now turn to the enhancement factors applied in this case.

### A.  *Section 40-35-114(1):  Prior History of Criminal Convictions/Behavior*

The trial court in this case found that the defendant had a previous history of criminal convictions or criminal behavior in addition to what was necessary to establish the appropriate range and, therefore, applied enhancement factor (1) from Code section 40-35-114 to his convictions for aggravated rape, especially aggravated kidnapping, and criminal exposure to HIV. *See* Tenn. Code Ann. § 40-35-114(1) (Supp.2000). Application of this enhancement factor is not included within the ensemble of errors catalogued by the defendant on appeal, and our review of the record discloses that enhancement factor (1) was properly considered and weighed in this case. In 1990, while serving in the military, the defendant threatened, assaulted, and kidnapped a female airman for which

he was prosecuted by general courts-martial and sentenced to seven years confinement and dishonorably discharged. Within a short time of his release, he then kidnapped and brutalized the minor victim in this case.

### B. Section 40-35-114(5): Exceptional Cruelty

The trial court in this case also found that the defendant treated the victim with exceptional cruelty during the commission of each conviction offense. Tenn. Code Ann. § 40-35-114(5) (Supp. 2000). The defendant concedes that the facts support application of enhancement factor (5) to the first rape offense involving fellatio. He argues, however, that this enhancement factor was erroneously applied to the especially aggravated kidnapping conviction.[3] We disagree.

The defendant was charged under subsection (a)(1) of the especially aggravated kidnapping statute, which proscribes, in part, false imprisonment "[a]ccomplished with a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1) (1997). Exceptional cruelty is not an element of this offense; therefore, if sustained by the facts, this enhancement factor is applicable. *See State v. Kern*, 909 S.W.2d 5 (Tenn. Crim. App. 1993); *State v. Carter*, 908 S.W.2d 410 (Tenn. Crim. App. 1995). At sentencing, the trial court noted and relied on the following facts as indicative of exceptionally cruel treatment:

> He tied her hands behind her; he put a toboggan over her head so she would not know where she was going; he brought her to that cabin, kept her hands behind her with those cuffs that's been described to this Court. That wasn't enough. He then took a rope, put it between her hands and raised her to the extent and each of us has experienced that as a kid or even as adults horsing around, you can't raise your arms very high. He hit her. He used a gun to get her there but then he threatened her with a knife and told her the consequences of what he would do.

These facts, we are convinced, meet the legal standard for enhancement factor (5) requiring exceptional cruelty in excess of what is needed to sustain a conviction for the particular offense. *See State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997). Not only did the defendant physically torture TH, he psychologically abused her. Recently in *State v. Adrian R. Arnett*, – S.W.3d –, No. E1998-00051-SC-R11-CD (Tenn., Knoxville, July 3, 2001), the psychological dimension of enhancement factor (5) in the context of an especially aggravated kidnapping was highlighted. The supreme court explained,

> As the record reflects, the victim was ordered into the back of her boyfriend's vehicle. She witnesses the defendant hit her boyfriend in

---

[3] The defendant neither concedes nor disputes application of the "exceptionally cruel" enhancement factor to his second rape conviction or his HIV exposure conviction.

-5-

the side of his head, hard enough to temporarily "daze him," thereby recognizing that the defendant was capable of, and perfectly willing to use, violence if she tried to resist. When her boyfriend managed to escape, the victim found herself on the floor of the moving vehicle, alone with two masked and potentially violent males in the middle of the night in an unfamiliar city.

When the vehicle stopped in a secluded area, the victim was physically dragged outside and thrown to the ground. She landed on her back as the defendant stood over her. She saw him unzip his pants, and she was then ordered to take off her clothes. When she did not comply, her clothes were forcibly ripped off of her body. The teenaged victim was eventually left alone, naked and bound. She was forced to untie herself, dress herself as best as she could as the defendant had taken some of her clothing, and, partially naked, knock on a stranger's door to seek help. In this case, the defendant went above and beyond placing the young victim in fear of her life; instead, the facts reveal evidence of exceptional mental cruelty separate and apart from the facts establishing the elements that constitute the offense of especially aggravated kidnapping.

*Id.* at –, slip op. at 7-8.

The abusive treatment of TH in this case was, at least from an objective standpoint, more egregious than that inflicted upon the victim in *Arnett*. Excluding the facts directly attendant to the oral and vaginal rapes in this case, the evidence reveals that the defendant forced the victim into his truck and shoved a toboggan over her head, thereby disorienting her while he drove around for approximately 45 minutes. At the cabin, the defendant lashed a tobacco stick between the victim's ankles, tied and chained her hands behind her back, and hoisted her by her chained hands into the air to the point that she was balancing on her toes. He repeatedly threatened the victim, and despite the sub-freezing temperature, he forced her to strip down to her underwear. The only piece of outer clothing that the victim could find when she had the chance to escape was her shirt, but it was ripped and useless. After hiding in the woods until the defendant left, the victim found a blanket in a trash bag in the cabin to cover her body. To summon help, the victim had no choice except to present herself, clothed only in the blanket, to strangers living in a nearby trailer.

We note that the trial court referred to the defendant's use of a gun and knife, but under the particular circumstances shown in this case, we do not believe that considering the weapons via the "exceptionally cruel" factor for sentence enhancement duplicates the deadly weapon element of especially aggravated kidnapping. *See* Tenn. Code Ann. § 39-13-305(a)(1) (1997). To be sure, aggressive tendencies are understood to be intertwined with violent crimes. Threatening to shoot a victim, for instance, is inherent in the offense of especially aggravated kidnapping committed by the use of a firearm and does not usually connote "exceptionally cruel" treatment. *See State v.*

-6-

*Turner*, 41 S.W.3d 663, 673 (Tenn. Crim. App. 2000). Inasmuch as a certain amount of cruelty is inherent in any especially aggravated kidnapping, the task becomes one of determining when "cruelty" reaches the level of being "exceptional." That level is achieved when the facts demonstrate "a culpability distinct from and appreciably greater than that incident to" the crime. *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997).

Aiming a gun or pointing a knife at a kidnapping victim almost invariably results in compliant submissiveness. The defendant, however, went above and beyond placing the victim in fear of her life. In subduing her at the pet store, the defendant slammed her against a wall, screamed for her to open her mouth, stuck his gun inside her mouth, and threatened to kill her. In our view, the invasion and violation of a body cavity with a deadly weapon can be, and in this case was, "exceptionally" cruel. Among other things, inserting the gun into the victim's mouth was unnecessary to kidnap this victim who, at the time, was approximately 5'4" tall and weighed 100 pounds.[4] A gunshot wound inflicted in that fashion, moreover, is nearly always fatal, and the physical disfigurement is particularly gory. The message that the defendant was willing not only to murder but also to butcher the victim in this fashion was, we are confident, not lost on this young girl.

As for the knife, there was evidence that while the victim was bound and suspended from the cabin ceiling, the defendant took a large, hunting type knife and traced it across and around the victim's exposed body. As he did so, the defendant told the victim what he planned to do to her and taunted her about becoming his "sex toy" for awhile. The Presentence Report indicates that the defendant also cut off some of the victim's hair with the knife and that he threatened to cut off her hands. The knife, in other words, was not employed to facilitate the victim's imprisonment; instead, it was wielded to terrorize the defenseless victim.

The facts in the case fully justify application of enhancement factor (5) to the especially aggravated kidnapping conviction.

### *C. Section 40-35-114(6): Particularly Great Personal Injuries*

The personal injuries that the victim in this case sustained were, without question, "particularly great," as the trial court found. The defendant does not dispute this finding or the resulting application of enhancement factor (6) to the conviction offenses. *See* Tenn. Code Ann. § 40-35-114(6) (Supp. 2000).[5] Based, however, on our *de novo* review of the record, we add the following comments and observations.

---

[4] According to the Presentence Investigation Report prepared in this case, the defendant is 5'9" and weighs 145 pounds.

[5] As previously noted, the aggravating factor alleged in the charging instrument for the kidnapping offense was use of a deadly weapon; serious bodily injury was not alleged. Similarly, with the rape offenses, the aggravating factor alleged was being "armed with a weapon"; the "bodily injury" aggravator was not charged. *See* Tenn. Code Ann. § 39-13-502(a)(1), (2) (1997).

The trial court's stated basis for applying enhancement factor (6) related to the victim's appendix. At some point during the second rape, the defendant punched TH in the stomach. A few days after her ordeal, the victim started having severe abdominal pain. Over the next few months, she was hospitalized on numerous occasions for diarrhea, vomiting, and dehydration. Shortly after Thanksgiving in 1999, the severe abdominal pain returned. Exploratory surgery revealed that the victim's appendix had been dislocated and was attached to her abdominal wall; the appendix was dangerously gangrenous and had to be removed.

This injury, in our view, justified enhancing the defendant's sentence for the second aggravated rape, but the connection with the other conviction offenses is a closer question. Nonetheless, our *de novo* review of the record reveals that the victim sustained severe psychological injuries attributable to all of the offense convictions. *See State v. Melvin*, 913 S.W.2d 195, 203 (Tenn. Crim App. 1995) (term "personal injury," as used in enhancement factor (6) is broad enough to embrace emotional injuries and psychological scarring sustained by victim).

In *Adrain R. Arnett*, the supreme court declined to require expert testimony or proof of the extent of a victim's psychological injuries before enhancement factor (6) could apply. Rather the court held that "application of the factor is appropriate where there is specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from [the] offense." *Adrian R. Arnett*, – S.W.3d at –, slip op. at 9. Such evidence could be presented, for instance, through live testimony of the victim or others or through specific examples included in the presentence report. *See id.*, slip op. at 9-10.

Included with the presentence report in this case are two lengthy victim impact letters submitted by the victim's mother and sister. They chronicle in vivid detail TH's emotional injuries and handicaps. Since her ordeal, TH has attempted suicide. She developed an eating disorder that, according to her treating pediatric psychiatrist, was a type of post-traumatic stress disorder whereby her body was trying to get rid of the pain resulting from the defendant's victimization of her; the victim has required in-patient treatment at a nearby psychiatric hospital for this disorder. The victim was ridiculed and shunned by classmates when she returned to school based on newspaper accounts that the defendant was HIV positive. She missed so much school because of illness and being hospitalized that she was unable to graduate with her class. She no longer attends church because her "faith has been shaken."

In our view, the contents of these letters, written by close family members, supply specific and objective evidence demonstrating how the victim's mental injuries are more serious or more severe than those which normally result from the conviction offenses. This evidence, combined with the evidence of the physical trauma to the victim's appendix, is certainly adequate to support application of enhancement factor (6).

*D. Section 40-35-114(7): Gratify Desire for Pleasure or Excitement*

The defendant also does not challenge the trial court's application of enhancement factor (7) that the defendant committed the aggravated rapes and especially aggravated kidnapping to gratify his desire for pleasure or excitement. *See* Tenn. Code Ann. § 40-35-114(7) (Supp. 2000). The trial court did not specify what facts supported this enhancement factor, stating only that the record "is full of things" that show why the defendant acted as he did. Even so, our *de novo* review persuades us that factor (7) applies.

Because pleasure or excitement is not an essential element of the offense of rape, it may be a viable sentence enhancing factor. *See State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993). The same holds true for especially aggravated kidnapping. *See State v. Antonio M. Byrd*, No. 02C01-9508-CR-00232, slip op. at 44 (Tenn. Crim. App., Jackson, Jan. 2, 1997) (that offense was committed for pleasure or excitement is not inherent in offense of especially aggravated kidnapping), *perm. app. denied* (Tenn. 1997). The defendant's "motive" for committing the offense is central to enhancement factor (7). *Adrian R. Arnett*, – S.W.3d at –, slip op. at 10; *State v. Kissinger*, 922 S.W.2d 482, 490 (Tenn. 1996).

The defendant in this case did not rob the pet store, and TH's pocketbook, coat, and money were left behind at the store. Nothing suggests that the kidnapping was financially inspired. The victim's testimony and evidence in this case indicate that the defendant abducted and raped her for sexual pleasure and gratification. Although ejaculation is not dispositive of motivation, *Kissinger*, 922 S.W.2d at 490, it is relevant, and in this case, the defendant ejaculated at least once during the first rape. He also instructed the victim how to perform fellatio and what to do with the semen. Another significant indicator of the defendant's motivation is his lewd remark to the victim that she was going to be his "sex toy." These facts, although not specified by the trial court, support the finding that the defendant committed the kidnapping and rapes to gratify himself.

*E. Section 40-35-114(9): Possessed or Employed a Firearm*

The trial court enhanced the defendant's sentence on the conviction offense of criminal exposure to HIV pursuant to factor (9) that the defendant "possessed or employed a firearm . . . or other deadly weapon during the commission of the offense." Tenn. Code Ann. § 40-35-114(9) (Supp. 2000). Because the aggravating element for the kidnapping and rape offenses involved a weapon and/or a deadly weapon, factor (9) did not come into play in determining the length of the defendant's sentences for those convictions.

The defendant does not argue that the trial court improperly considered enhancement factor (9) with respect to the HIV exposure conviction, and we find no basis in the record to fault the trial court's determination in this regard. The victim's testimony about the gun and the large hunting knife that the defendant possessed is sufficient to support this factor.

*F. Section 40-35-114(12): Bodily Injury Enhancement Factor*

Even though "bodily injury" was not alleged as an element of the aggravated rape or especially aggravated kidnapping offenses, the defendant argues that the trial court erred in applying to those convictions enhancement factor (12) that the defendant "willfully inflicted bodily injury upon another person" or that his actions "resulted in the death or serious bodily injury to a victim." Tenn. Code Ann. § 40-35-114(12) (Supp. 2000). The defendant appears to be complaining that although the victim sustained bodily injury, the injury is attributable only to the second rape and should not be used to enhance either the first aggravated rape sentence or the especially aggravated kidnapping sentence.

The trial court did not articulate a reviewable basis for applying factor (12). Enhancement on that basis, it commented, "goes to those other things that he did" and "[i]n particular going back to that appendix and those things." Considerations similar to those that influenced our *de novo* treatment of enhancement factor (6) are involved with enhancement factor (12). "Bodily injury," as referenced in enhancement factor (12) includes "physical pain or temporary illness or impairment of the function or a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (1997). "Serious bodily injury," also referenced in enhancement factor (12) includes "[p]rotracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(34).

In addition to having the defendant punch her in the stomach, the victim was exposed to below freezing temperatures while hiding naked in the woods until the defendant drove away from the cabin. In particular, the victim's feet were red and swollen for days because of exposure to the cold. The victim, according to her mother, was fearful that her feet would have to be amputated. Furthermore, as a result of the defendant's sadistic treatment, the victim developed an eating disorder, and at one point she weighed roughly 80 pounds. The eating disorder was diagnosed as a manifestation of post-traumatic stress. At another point, the victim attempted suicide. These physical and mental impairments readily qualify for consideration pursuant to enhancement factor (12) and properly enhance the kidnapping and rape convictions. Because, however, of the factual overlap between factors (6) and (12), factor (12) is deserving of less weight. *See, e.g., State v. Charles Chesteen*, No. E1999-00910-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Knoxville, June 8, 2000) (factor (15) applied in theft case but assigned moderate weight in view of the application of factor (4)).

*G. Section 40-35-114(16): Potential for Injury Great*

The last enhancement factor applied by the trial court was (16), that the crime was "committed under circumstances under which the potential for bodily injury to a victim was great." Tenn. Code Ann. § 40-35-114(16) (Supp. 2000). The trial court applied this factor to the criminal exposure to HIV conviction offense. The defendant has not complained about the application of factor (16), but we conclude, as a matter of first impression, that this factor is inapplicable.

Enhancement factor (16), in our opinion, is inherent in the offense of criminal exposure to HIV. In *State v. Pamela Denise Wiser*, No. M1999-02500-CCA-R3-CD (Tenn. Crim. App., Nashville, Oct. 30, 2000), the defendant was convicted of 22 counts of criminal exposure to HIV. The sentencing court applied, *inter alia*, enhancement factor (10), which requires that a defendant have "no hesitation about committing a crime when the risk to human life [sic] high." Tenn. Code Ann. § 40-35-114(10) (Supp. 2000). On appeal, this court held that enhancement factor (10) is inherent in that offense and, therefore, should not have been applied. The court explained,

> At the heart of the criminal statute which prohibits a person from knowingly exposing another to HIV without consent lies the fact that this disease is ultimately fatal. It follows that high risk to human life is inherent in committing the crime. Therefore, enhancement factor (10) is inapplicable to enhance sentences for violating Tenn. Code Ann. § 39-13-109 (1997).

*Pamela Denise Wiser*, slip op. at 8. We conclude that factor (16) also is inherent in the criminal exposure to HIV offense. The trial court, accordingly, erred in considering that factor.

### III. Mitigating Factors

As for mitigation, the trial court took into consideration that the defendant had apologized to the victim during the plea and sentencing proceedings. The trial court assigned little weight to this mitigating factor. No challenge has been raised to this factor, and we see no basis to disturb the trial court's assessment in this regard.

### IV. Weighing the Appropriate Sentencing Factors

Our *de novo* review of the enhancement and mitigating factors yields six applicable enhancement factors and one minor mitigating factor, with some of the enhancement factors applying to less than all of the convictions as follows:

| Conviction | Applicable Enhancement Factors |
| --- | --- |
| HIV Exposure | (1), (5), (6), (9) |
| Especially Aggravated Kidnapping (Count 1) | (1), (5), (6), (7), (12) |
| Aggravated Rape (Count 2) | (1), (5), (6), (7), (12) |
| Aggravated Rape (Count 3) | (1), (5), (6), (7), (12) |

In weighing the enhancement factors, the trial court indicated that factors (5) and (7) deserved great weight. Consistent with our *de novo* review, we conclude that factor (6) is also deserving of great weight, particularly considering the psychological abuse, trauma, and injury to the victim.

For the especially aggravated kidnapping and the aggravated rape convictions, the presumptive midpoint of the defendant's sentencing range was 20 years. The trial court increased each sentence by five years to take into account the enhancement factors, decreased each sentence by one year in recognition of the defendant's apology as a mitigating factor, and arrived at a sentence of 24 years for each Class A felony. We agree that the number and weight of enhancement factors and the slight weight of the one mitigating factor fully justify the 24-year sentence for each Class A felony.

As for the Class C HIV exposure conviction, the defendant's sentencing range was three to six years, and the trial court imposed a maximum six-year sentence. Although the trial court should not have considered enhancement factor (16), that error does not equate to a reduction in the sentence. *See State v. Keel*, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994). The applicable enhancement factors, (1), (5), (6), and (9), support the trial court's determination, and we will not disturb the sentence imposed.

## V. Consecutive Sentencing

The trial court ordered the defendant's sentences to be served consecutively for an effective sentence of 78 years. The trial court found that the defendant was a dangerous offender who "need[ed] to be removed from society for as long a period of time" as the law allows. The defendant complains that the trial court improperly used consecutive sentencing as a vehicle for imposing a sentence of life without parole. We disagree and affirm the consecutive sentencing ordered in this case.

Code section 40-35-115 addresses consecutive sentencing and the criteria for ordering consecutive, instead of concurrent, sentencing. Tenn. Code Ann. § 40-35-115(a) (1997). One statutory basis upon which to impose consecutive sentencing is that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." *Id*. § 40-35-115(b)(4). To support consecutive sentencing of a "dangerous" offender, the evidence must demonstrate that the "terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

The trial court in this case pointed to how the defendant had brutalized the victim; indeed, the trial court noted for the record that it had "never seen a more horrendous crime outside of a homicide" than what happened in this case. The trial court also relied on the defendant's indifference to the contagious and lethal nature of his disease. *See Pamela Denise Wiser*, slip op.

at 10 (trial court correctly found that defendant was dangerous based on proof that defendant repeatedly exhibited reckless indifference about the contagious nature of her disease and the potential for death that existed). We share the trial court's opinion that the horrendous circumstances of the offenses reflect no appreciation or respect whatsoever for the value of life and no impulse control even when the risk to human life is high.

As for *Wilkerson*'s requirement of necessity to protect the public, nothing in the record refutes the need for an extended sentence of incarceration. Favorable factors, such as a defendant's youthfulness, lack of criminal record, or potential for rehabilitation, are not present. *See Tadaryl Darnell Shipp*, No. 03C01-9907-CR-00312, slip op. at 5 (Tenn. Crim. App., Knoxville, Mar. 21, 2000) (noting these favorable factors). The defendant was 35 years old at the time of the offenses, and this case was not the first time that he had kidnapped and abused a female. He already had a criminal record for kidnapping and assaulting a military servicewoman. Finally, as in *Tadaryl Darnell Shipp*, "the circumstances of the offenses are *so egregious* that they not only serve to identify [the defendant] as a dangerous offender, but they also inform the inquiry into whether the extended sentence is necessary in order to protect the public." *Id.*, slip op. at 5 (emphasis added). Consecutive sentencing is eminently appropriate in this case. Such sentencing is reasonably related to the seriousness of the offenses and is necessary to safeguard the public.

From our review of the length of the defendant's sentences and the consecutive service ordered, we affirm the final judgments and sentences imposed.

_____
JAMES CURWOOD WITT, JR., JUDGE